## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**BORIS STOGNER**                                        **CIVIL ACTION**

**versus**                                                        **NO. 12-2703**

**N. BURL CAIN, WARDEN**                       **SECTION: "H" (1)**

## REPORT AND RECOMMENDATION

   This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

   Petitioner, Boris Stogner, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On July 10, 2008, he was convicted of two counts of aggravated

rape under Louisiana law.[1]  On August 12, 2008, he was sentenced on each count to a concurrent term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2]  On June 19, 2009, the Louisiana First Circuit Court of Appeal affirmed his convictions, amended his sentences to specify that they be served at hard labor, and affirmed the sentences as amended.[3]  His related writ applications were then denied by the Louisiana Supreme Court on March 26, 2010,[4] and by the United States Supreme Court on October 4, 2010.[5]

On or about August 16, 2011, petitioner filed an application for post-conviction relief with the state district court.[6]  That application was denied on November 28, 2011.[7]  His related writ applications were likewise denied by the Louisiana First Circuit Court of Appeal on March 12, 2012,[8] and by the Louisiana Supreme Court on September 14, 2012.[9]

---

[1]  State Rec., Vol. IV of V, transcript of July 10, 2008, p. 95; State Rec., Vol. I of V, minute entry dated July 10, 2008; State Rec., Vol. I of V, jury verdict forms.

[2]  State Rec., Vol. IV of V, transcript of August 12, 2008; State Rec., Vol. I of V, minute entry dated August 12, 2008.

[3]  State v. Stogner, No. 2009 KA 0172, 2009 WL 1717173 (La. App. 1st Cir. June 19, 2009); State Rec., Vol. V of V.

[4]  State v. Stogner, 29 So.3d 1249 (La. 2010) (No. 2009-KO-1682); Rec. Doc. 4, p. 86.

[5]  Stogner v. Louisiana, 131 S.Ct. 117 (2010) (No. 09-10884); Rec. Doc. 4, p. 87.

[6]  State Rec., Vol. IV of V.

[7]  State Rec., Vol. IV of V, Judgment and Reasons for Judgment dated November 28, 2011.

[8]  State v. Stogner, No. 2011 KW 2389 (La. App. 1st Cir. Mar. 12, 2012); State Rec., Vol. IV of V.

[9]  State ex rel. Stogner v. State, 97 So.3d 1017 (La. 2012) (No. 2012-KH-0758); State Rec., Vol. IV of V.

On November 2, 2012, petitioner filed the instant application for federal *habeas corpus* relief.  The state concedes that the application is timely and that petitioner exhausted his remedies in the state courts.[10]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

---

[10]  Rec. Doc. 14, pp. 3 and 5.

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways.  First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.  Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not

> apply or unreasonably refuses to extend that principle to a new
> context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000).  The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one."   Bell, 535 U.S. at 694; see also Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."), cert. denied, 132 S.Ct. 1537 (2012).

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

## II.  Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> On September 28, 2005, Margaret Ryals, a child protection investigator with the Office of Community Services, received a phone call from Sister Debbie Thomas, the principal of Faith Tabernacle Academy.  Based on what Sister Debbie told her, Ryals went to the home of Mary Stogner and her husband, the defendant, on Otis Bickham Road in Franklinton, Washington Parish.  The defendant was not home because he had been checked into drug rehab.  Ryals spoke with Mary's daughters (the defendant's stepdaughters), eleven-year-old E.D. (hereinafter "E.D.1") and her younger sister, six-year-old E.D. (hereinafter "E.D.2").  E.D.1 and E.D.2 disclosed to Ryals they were molested or raped by several people.  E.D.1 named the defendant, "Pee Wee," a family friend, Larry Duncan ("Uncle Larry"), who lived nearby, and Terry (Larry's girlfriend) as the offenders.  E.D.2 named two of her brothers as the offenders.  Also living in the house were Ruben Stogner ("Paw Paw") and three brothers of E.D.1 and E.D.2.  The Stogners and Duncans are cousins.  Ryals had all of the children removed from the home. E.D.1 and E.D.2 were placed in foster care.
>
> Ryals contacted Detective Rochelle Hartmann, a juvenile investigator with the Washington Parish sheriff's office.  Detective Hartmann scheduled interviews at the Children's Advocacy Center (CAC) in Covington.  E.D.1 was brought to CAC, where she was interviewed by Jo Beth Rickels, a forensic interviewer.  A few weeks later, E.D.2 was brought to CAC, where she was interviewed by Bethany Case, a forensic interviewer.  Shortly thereafter, Lisa Tadlock, a licensed clinical social worker, began counseling E.D.1 and E.D.2.  After the girls made further disclosures of sexual abuse by the defendant, Tadlock contacted Detective Hartmann.  Detective Hartmann scheduled second CAC interviews for E.D.1 and E.D.2. In her second interview, E.D.1 was again interviewed by Rickels.  In her second interview, E.D.2 was again interviewed by Case.  Viewed in the entirety, the CAC interviews and the trial testimony of E.D.1,

E.D.2, and Tadlock indicated the defendant vaginally, anally, and orally raped E.D.1, and vaginally raped E.D.2.

In February 2006, the defendant agreed to give a recorded statement to Detective Hartmann.  In his statement, the defendant neither confirmed nor denied that he sexually abused his stepdaughters, but rather maintained he could not remember if such allegations of abuse were true because he was addicted to pain medication.  The defendant testified at trial.  He denied sexually abusing E.D.1 and E.D.2.  He felt E.D.1 and E.D.2 were coached into making allegations of sexual abuse against him.[11]

### III.  Petitioner's Claims[12]

### A.  Sufficiency of the Evidence

Petitioner claims that there was insufficient evidence to support his convictions.  On direct appeal, the Louisiana First Circuit Court of Appeal rejected that claim, holding:

> [T]he defendant argues the evidence was insufficient to support the convictions.  Specifically, the defendant contends that the CAC statements and trial testimony of E.D.1 and E.D.2, as well as the lack of physical evidence, failed to establish the elements of aggravated rape.  The defendant further contends that, while E.D.1 and E.D.2 may have been sexually abused by other family members, E.D.1 and E.D.2 did not identify the defendant as having molested them until after nine months of counseling, which suggests the girls were coached into identifying the defendant.
>
> A conviction based on insufficient evidence cannot stand as it violates due process.  See U.S. Const. amend. XIV; LSA-Const. art. I, § 2.  The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U .S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); see also LSA-CCr.P. art. 821(B); State v.

---

[11]   Stogner, No. 2009 KA 0172, 2009 WL 1717173, at *1; State Rec., Vol. V of V.

[12]   For ease of analysis, this opinion will discuss petitioner's claims in a different order than they were listed in his federal application.  However, all of the claims will be fully addressed.

Ordodi, 06-0207 (La. 11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988). The Jackson standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that, in order to convict, the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno, 01-2585 (La.App. 1st Cir. 6/21/02), 822 So.2d 141, 144.

Louisiana Revised Statute 14:42 provides, in pertinent part:

> A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:

> * * *

> (4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.

Louisiana Revised Statute 14:41 provides, in pertinent part:

> A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.

Aggravated rape is a general intent crime. State v. McDaniel, 515 So.2d 572, 575 (La.App. 1st Cir. 1987), writ denied, 533 So.2d 10 (La. 1988). General criminal intent is present whenever there is also specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. LSA-R.S. 14:10(2). The trier of fact is to determine the requisite intent in a criminal case. State v. Crawford, 619 So.2d 828, 831 (La.App. 1st Cir.), writ denied, 625 So.2d 1032 (La. 1993).

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting

testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.  The trier of fact's determination of the weight to be given evidence is not subject to appellate review.  An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt.  State v. Taylor, 97-2261 (La.App. 1st Cir. 9/25/98), 721 So.2d 929, 932.

The testimony elicited at trial established that, shortly after making allegations of sexual abuse by the defendant to Sister Debbie and Margaret Ryals, E.D.1 and E.D.2 gave individual interviews at CAC.  In these first interviews, the girls provided sparing detail regarding the defendant's sexual abuse of them.  For example, E.D.1 stated that other family members, not including the defendant, touched her inappropriately.  In her interview, E.D.2 stated she told Sister Debbie that she saw the defendant and E.D.1 touch each other.  The defendant pulled their pants down and "they got on top of each other."  After being shown anatomically-correct male and female dolls, E.D.2 stated the defendant got on top of E.D.1 and stuck his "thing" in her.  She further stated that something like that never happened to her (E.D.2).

Shortly after E.D.2's CAC interview, Tadlock began counseling both E.D.1 and E.D.2.  E.D.1 and E.D.2 underwent twenty-seven sessions of therapy from October 24, 2005, to September 7, 2006.  Tadlock testified at trial that during their initial evaluations, both girls talked about sexual abuse by the defendant.  They both talked about being taken out of their mother's home because the defendant had "put his thing in them."  A period of time followed where the girls did not talk about the abuse.  After some time, Tadlock was able to build a rapport with the girls, and they began to disclose more.  E.D.2 told Tadlock that Paw Paw Ruben, Big Larry, Little Larry, and the defendant "all did it to her."  After eighteen sessions of therapy, Tadlock contacted Detective Hartmann and told her the girls had recently made detailed statements about the sexual abuse.  Detective Hartmann visited Tadlock's office and spoke with Tadlock.  Tadlock told Detective Hartmann that E.D.1 told her (Tadlock) the defendant took her in the room, pushed her on the bed, and held her arms behind her head.  The defendant tried to penetrate her vaginally and anally.  E.D.1 also performed oral sex on the defendant.  Detective Hartmann sat in on the therapy session and, based on what she heard E.D.1 and E.D.2 tell Tadlock, she scheduled E.D.1 and E.D.2 for a second CAC interview.

In her second CAC interview, E.D.1 stated the defendant touched her chest and vagina. She stated that other family members also inappropriately touched her. On one occasion, the defendant tried to stick his penis in her "butt." She indicated with her forefinger and thumb almost touching that he "came that close." She further stated, with this same fingers gesture, that one time he got that close "sticking it all the way in." Finally, she indicated the defendant made her touch his penis with her mouth. E.D.1 did not state the word "mouth." Instead, she pointed to her mouth. She also pointed to the mouth on a drawing of a girl.

In her second CAC interview, E.D.2 stated the defendant touched her in the wrong spots in the bedroom. The defendant also did this to E.D.1. E.D.2 indicated that, while her clothes were off, the defendant touched her vagina with his penis. When asked if he touched her on the inside or outside with his penis, E.D.2 stated "inside." E.D.2 was shown anatomically-correct clothed male and female dolls. E.D.2 was told to consider the male doll to be the defendant and the female doll to be her (E.D.2) and to demonstrate what happened. E.D.2 took all of the clothes off of the dolls, including the underwear. She stated the defendant had on a "dirty movie." She put the girl doll on its back. She put the boy doll on top of the girl doll and moved it several times back and forth. She indicated the boy doll's penis was inside the girl doll's vagina. When she was asked what part of her body hurt, E.D.2 pointed to the doll's vagina. E.D.2 also indicated she saw the defendant on top of E.D.1 in her mother's bedroom.[FN4]

> [FN4] E.D.1's two CAC interviews and E.D.2's two CAC interviews were submitted into evidence at trial and played for the jury.

At trial, E.D.1 testified on direct examination the defendant did "bad touching" to her. When the prosecutor asked her if the defendant touched her with his "private part," E.D.1 responded, "I think so." Regarding how the bad touching started when E.D.1 was with the defendant in her mother's bedroom, the following colloquy between the prosecutor and E.D.1 took place:

> Q. How would he touch you?
>
> A. Well he would try to get me to take off my clothes, and, you know, he would just like start feeling on –

Q. What part of his body did he use when he was feeling you?

A. Sometimes his hands.

Q. Did he ever use any other part of his body?

A. I think once.

Q. What part of his body did he use once?

A. Goodness.  His private part, I think.

Q. What part of your body did he touch with his private part?

A. It depends on which time.

Q. Tell me what parts of your body, altogether, did he touch?

A. My butt and one time here in the private part –

Q. When you say here, can you tell us with words what part that is?

A. My private part.

Q. When he touched your butt with his private part, was his private part on the outside or inside, if you could tell?

A. I don't really remember that part.

Q. When his private part touched your private part, do you remember if it was inside?

A. I think he was a little bit from going, like not inside but, you know, and then my mom pulled up that time.

E.D.1 further testified the defendant would try to get her not to tell by giving her money.  On cross-examination, E.D.1 testified that she remembered telling Ms. Ryals that "Pee Wee" (a family friend) "put his thing" in her butt, vagina, and mouth.  When asked if "Pee Wee" had actually "stuck his thing" in her vagina and butt, E.D.1 replied, "Yes."  She also indicated that "Popcorn" (Uncle Larry's son) "stuck his private" in her "private" and "butt."  Defense counsel then questioned E.D.1 regarding whether the defendant penetrated her:

> Q. I think, and it was hard for me to hear, but I think what you said was that he never stuck his private inside your private.  Is that right?
>
> A. Well, he got, like, very close.
>
> Q. He got close to it but never stuck it inside?
>
> A. Well, it was, like, that close. (Indicating.)

E.D.2 testified on direct examination at trial that the defendant touched her "in the wrong places," namely the "private part."  The prosecutor showed E.D.2 drawings of a nude boy and a nude girl.  E.D.2 was given a pen and asked to mark the part of the defendant's body he used to touch her "private part."  E.D.2 circled the boy's penis, his hands, and his head.  E.D.2 indicated this took place in her mother's bedroom when her mother was not there.  She further testified there was a "dirty movie" on television, and the defendant took off both of their clothes.  When asked where she was when the defendant touched his "private part" on her "private part," E.D.2 responded, "Laying on the bed."  When asked what it felt like, E.D.2 responded, "It didn't feel good."  She further testified the defendant told her not to tell anyone that he did this.

Detective Hartmann testified at trial that the defendant agreed to give her a recorded statement.  Prior to giving the statement, the defendant was <u>Mirandized</u>.  Detective Hartmann testified she knew the defendant had been out of rehab for a while, but he did not appear to be drunk or under the influence when he gave the statement.  The audiotape of the defendant's statement was introduced at trial and played for the jury.  A transcript of the statement was provided to the jury to assist them.  In his statement, the defendant indicated he could not remember many things regarding the allegations of his sexual

abuse of E.D.1 and E.D.2.  He stated he was addicted to pain medication and was taking more than the prescribed amount.  He disclosed that his father raped him when he was in the sixth grade. During the questioning, while the defendant did not admit to sexually abusing E.D.1 and E.D.2, he did not deny it.  For example, Detective Hartmann asked, "And kind of confirming what [E.D.1's] saying has been happening with her since she was like 9. [Urn]  Would you say that absolutely didn't happen and she's lying or what would you say to that?"  The defendant responded, "it could be true if I was on pills. I mean I don't know you know I don't remember."  When Detective Hartmann pointed out that E.D.1 named the defendant as one of the people sexually abusing her, and that there was no reason for her to lie, the defendant responded, "I ain't saying that she's lying."  Shortly thereafter, the following colloquy took place:

> Hartmann:   Ok so if each one of [them] said to me Borris [sic] stuck his penis in my butt, your [sic] saying their [sic] not lying about that?
>
> Stogner:  I ain't saying they lying.
>
> Hartmann: Um-huh[.]
>
> Stogner:  I would just you know.
>
> Hartmann:  Who who did you do that to? That that's what I really need to get from you.  I want you to validate to me what their [sic] saying.  Cause [sic] if you don't then that they're lying.
>
> Stogner:  It probably if it did happen it might have been the two girls.  Cause [sic] I don't I mean.
>
>                       * * *
>
> Hartmann:  What about [E.D.1]?
>
> Stogner:  Like I said, if it if it did.
>
> Hartmann:  Not if not let lets [sic] [inaudible].

Stogner:  If it did it could have been the two girls. There I don't I don't remember it you know.

Hartmann:  Right.  If [E.D.1] says that happen [sic] is she telling the truth?

Stogner:  I ain't saying she lying.

Hartmann:  But does that mean she's telling the truth?

Stogner:  She yeah she could be telling the truth but.

Hartmann:  What about [E.D.2] ...

Stogner:  The same thing.

Hartmann:  You had sex with her.

Stogner:  She could be telling the truth I mean you know.

At the close of the interview, Detective Hartmann asked, "But your [sic] not going to deny that if they're saying it happen[ed]?" The defendant responded, "No no I'm not denying it."

The defendant testified on direct examination at trial that he was addicted to pain pills at the time he gave his statement to Detective Hartmann, and that he did not remember saying anything. He stated he had prior convictions for DWI and two counts of resisting arrest.  He denied sexually abusing E.D.1 and E.D.2.  When defense counsel asked him why he did not simply tell Detective Hartmann that he did not do that, the defendant said because he was taking pain pills and did not know what he was saying.  When asked why the girls accused him, the defendant replied that he believed his girls were coached into saying what they said.

The defendant suggests in his brief that E.D.1 and E.D.2 were coached into accusing the defendant because they made no allegations of sexual abuse in their first CAC interviews.  However, after over nine months of therapy, they accused the defendant of sexual abuse in the second CAC interviews.  In his brief, the defendant asserts:

> After nine months of counseling, numerous
> interviews, removal from their home and living with
> relative strangers, it is no wonder that the girls
> probably decided that the only way to make it end
> was to give the answers the State workers wanted to
> hear. By that time they knew what responses would
> get their approval.

In her first CAC interview, E.D.1 did not disclose any sexual abuse regarding the defendant; yet several months later, after undergoing therapy, she disclosed at the second CAC interview how the defendant sexually abused her. Likewise, although E.D.2 spoke at her first CAC interview about seeing the defendant sexually abuse E.D.1, she indicated that nothing like that had happened to her. However, in her second CAC interview after months of undergoing therapy, E.D.2 disclosed how the defendant sexually abused her.

Dr. Atzemis testified about the disclosure process regarding a child that has been sexually abused. Out of naivety, embarrassment, or fear, a child might not disclose the abuse. Most children do not tell right away, but rather there is a time period or delay. This so-called "delayed disclosure" can be weeks, months, or years after the event. Dr. Atzemis further noted that recantation is a known phenomenon in child abuse. The main reason a child will recant is if she is taken away from her family, which is her only support. Dr. Atzemis also explained that early disclosure typically involves abuse by a stranger or someone who is unrelated to the child. However, the amount of time it takes to disclose definitely increases if the abuser is someone the child loves or who lives in the home. She further indicated that many children first choose to tell a friend or someone that they feel they can talk to. However, they reveal just little bits of information, waiting for a reaction before they decide to tell more.

When Detective Hartmann was under cross-examination, defense counsel wondered why, on several occasions, E.D.1 and E.D.2 denied the defendant did anything bad to them. Detective Hartmann responded, "It's very typical of sexually abused children to do that." Rickels also testified that it is not unusual at all for a child to begin making disclosures after that child has been in counseling or foster care for a period of time. During her cross-examination, Case opined:

– 15 –

It is so much more difficult for kids who were
abused by someone that's close to them to talk about
what's happened.  A lot of kids will even say, no,
nothing happened.  Nothing at all.  And they take
everything back because they don't want to hurt their
family, and they would rather keep it a secret to
themselves about what's happened, than mess up their
family.  This family went through horrible trauma
being torn apart.

During trial, defense counsel asked Tadlock why E.D.1 and
E.D.2 disclosed more information about the sexual abuse during their
July, 2006 CAC interviews than they did at trial.  Tadlock responded,
"Court proceedings are intimidating to adults, let alone children.  And
in that situation, it doesn't surprise me that they were having
difficulty talking about things in detail."

When a case involves circumstantial evidence, and the jury
reasonably rejects the hypothesis of innocence presented by the
defendant's own testimony, that hypothesis falls, and the defendant
is guilty unless there is another hypothesis which raises a reasonable
doubt.  State v. Captville, 448 So.2d 676, 680 (La. 1984).  In the
instant matter, the defendant's hypothesis of innocence was based on
his denial that he raped E.D.1 and E.D.2, and that the girls alleged he
raped them because they were coached into making the allegations.
In finding the defendant guilty of two counts of aggravated rape, it is
clear the jury resolved against the defendant any conflicts between the
testimony of the defendant and E .D.1 or E.D.2, as well as any
apparent conflicts between the first and second interviews of E.D.1
and E.D.2, or the interviews and trial testimony.  See Captville, 448
So.2d at 679.  The fact that the record contains evidence which
conflicts with the testimony accepted by a trier of fact does not render
the evidence accepted by the trier of fact insufficient.  State v. Quinn,
479 So.2d 592, 596 (La.App. 1st Cir. 1985).  We are constitutionally
precluded from acting as a "thirteenth juror" in assessing what weight
to give evidence in criminal cases.  See State v. Mitchell, 99-3342
(La. 10/17/00), 772 So.2d 78, 83.

In finding the defendant guilty, it is clear the jury rejected the
defendant's hypothesis of innocence.  The jury's verdicts reflected
the reasonable conclusion that, based on the testimony of E.D.1,
E.D.2, Lisa Tadlock, Detective Hartmann, the CAC interviews, and
the culpable remarks made by the defendant in his statement to
Detective Hartmann, the defendant raped E.D.1 and E.D.2.  It is also

obvious from the finding of guilt that the jury concluded that the testimony of these witnesses was more credible than the testimony of the defendant.

While there was no physical evidence to prove the rapes had occurred, as pointed out by the defendant, it is not necessary that there be physical evidence to prove the defendant committed aggravated rape. The testimony of the victim alone is sufficient to prove the elements of the offense. State v. Orgeron, 512 So.2d 467, 469 (La.App. 1st Cir. 1987), writ denied, 519 So.2d 113 (La. 1988). The testimonial evidence was sufficient to establish the elements of aggravated rape, specifically the element of penetration. LSA-R.S. 14:41(B) provides that "[e]mission is not necessary" and that "any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." See State v. Rives, 407 So.2d 1195, 1197 (La. 1981). Moreover, Dr. Atzemis testified that E.D.1 and E.D.2 were taken to Children's Hospital, where they underwent physical examinations, on or about October 24, 2005. The children were removed from their home on September 28, 2005. Thus, assuming the sexual abuse continued to the latest possible day, it would have been almost a month from the time of the abuse until E.D.1 and E.D.2 were physically examined. Dr. Atzemis testified that about 95% of the sexual abuse victims they see have a normal exam. The genitalia are designed in such a way, according to Dr. Atzemis, that there are very rarely scars for a doctor to see. Furthermore, if the last incident of sexual abuse had been at least a month prior to her visit, Dr. Atzemis would not expect to see tearing or physical evidence.

After a thorough review of the record, we are convinced that viewing the evidence in the light most favorable to the state, a rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the aggravated rape of E.D.1 and the aggravated rape of E.D.2. Accordingly, this assignment of error is without merit.[13]

---

[13] Stogner, No. 2009 KA 0172, 2009 WL 1717173, at *5-12; State Rec., Vol. V of V.

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[14]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  To that end, it must be remembered that "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ...  Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Cavazos v. Smith, 132 S.Ct.2, 4 (2011).

In the instant case, petitioner has not made the showing required to be granted relief under the AEDPA.  The state court correctly noted that claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a

---

[14]  State v. Stogner, 29 So.3d 1249 (La. 2010) (No. 2009-KO-1682); Rec. Doc. 4, p. 86.

*rational* decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added).  Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."  Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S.Ct. 2060, 2062 (2012).[15]

   In the instant case, the elements of the crimes were established through the testimony of the victims themselves.  In light of that testimony, no further evidence was constitutionally required, because the victims' testimony was alone sufficient to support the convictions.  Peters v. Whitley, 942 F.2d 937, 941-42 (5th Cir. 1991); see also Fetterley v. Whitley, No. 94-30310, 1994 WL 708655, at *1 n.6 (5th Cir. Dec.  6, 1994); Crumholt v. Cain, Civ. Action No. 11-2543, 2011 WL 6329934, at *8 (E.D. La. Nov. 29, 2011), adopted, 2011 WL 6329868 (E.D. La. Dec. 19, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *26 (E.D. La. Oct. 29, 2009).

---

 [15]  Further, it must be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal *habeas corpus* proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof.  Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 Fed. App'x 405 (5th Cir. 2011), cert. denied, 132 S.Ct. 1713 (2012); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 Fed. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 132 S.Ct. at 2064 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

Moreover, although petitioner disputes the credibility of the victims, witness credibility is an issue for the jury, not a federal *habeas* court.  Where a petitioner's insufficient evidence claim is based on the credibility of a witness, a federal *habeas* court generally will not grant relief.  See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A "challenge of the jury's credibility choice fails to satisfy the Jackson standard for habeas relief."); Phillips v. Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012); Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

For the reasons noted by the state court, the evidence presented in the instant case, viewed in the light most favorable to the prosecution, was sufficient for any rational trier of fact to find petitioner guilty beyond a reasonable doubt.  Therefore, he cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, under the "twice-deferential" standard of review of such claims mandated by the AEDPA,  this Court should likewise reject petitioner's claim challenging the sufficiency of the evidence.

B.  Confrontation Clause

Petitioner also claims that his right to confrontation was violated when the victims were allowed to testify by closed-circuit television.  On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> [T]he defendant argues the trial court erred in allowing the juvenile witnesses to testify by closed-circuit television.  Specifically, the defendant contends that, pursuant to LSA-R.S. 15:283, there was no specific finding that face-to-face testimony would be injurious to the children.
>
> Louisiana Revised Statute 15:283 provides, in pertinent part:
>
>> A. On its own motion or on the motion of the attorney for any party, a court may order that the testimony of a protected person who may have been a witness to or victim of a crime be taken in a room other than the courtroom and be simultaneously televised by closed circuit television to the court and jury, when the court makes a specific finding of necessity based upon both of the following:
>>
>> (1) Expert testimony that the protected person would be likely to suffer serious emotional distress if forced to give testimony in open court.
>>
>> (2) Expert testimony that, without such simultaneous televised testimony, the protected person cannot reasonably communicate his testimony to the court or jury.[FN2]
>>
>> [FN2]  A "protected person" means a person who is the victim of a crime under the age of seventeen years.  See LSA-R.S. 15:283(E)(1).
>
> The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him.  This right provides two types of protections for a criminal defendant: the right physically to face those who testify

against him and the right to conduct cross-examination.  Coy v. Iowa, 487 U.S. 1012, 1017, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857 (1988). Public policy considerations and necessities, however, may take precedence over "face-to-face" confrontation.  Maryland v. Craig, 497 U.S. 836, 849, 110 S.Ct. 3157, 3165, 111 L.Ed.2d 666 (1990).

The Craig court addressed whether the Confrontation Clause of the Sixth Amendment categorically prohibits a child witness in a child abuse case from testifying against a defendant at trial, outside of the defendant's physical presence, by one-way closed-circuit television.  Craig, 497 U.S. at 840.  The state sought to invoke a Maryland statutory procedure, similar to LSA-R.S. 15:283, permitting a judge to receive, by one-way closed-circuit television, the testimony of a child who is alleged to be a victim of child abuse. To invoke the procedure, the trial judge must first "determin[e] that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate." Md. Cts. & Jud. Proc. Code Ann. § 9-102(a)(l)(ii)(1989).  Craig, 497 U.S. at 840-41.

The Craig court held:

> [I]f the State makes an adequate showing of necessity, the [S]tate interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.

Craig, 497 U.S. at 855.  The Craig court elaborated on the requisite finding of necessity, which must be a case-specific one:

> The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify.  The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant....  Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, i.e., more than "mere

> nervousness or excitement or some reluctance to
> testify."

<u>Craig</u>, 497 U.S. at 855-56 (citations omitted).

On July 8, 2008, the state filed a motion for the closed-circuit broadcast of the testimony of the victims under LSA-R.S. 15:283. The state contended the children would likely suffer serious emotional distress if forced to give testimony in open court and that, without the requested accommodation, the children could not reasonably communicate their testimony to the jury.

At the hearing on the motion, Lisa Tadlock, a licensed clinical social worker, testified for the state. She was accepted as an expert in the field of social work with a particular expertise in dealing with sexually abused children. In his brief, the defendant asserts there was no specific showing that the presence of the girls in the courtroom would have caused them serious emotional distress. He further contends, "All [Tadlock] could say was that the girls did not want to testify in an open courtroom, and facing [him] would hamper them in telling their stories to the jury." According to the defendant, the factors Tadlock gave in support of her opinions were "all general in nature" and that none of these generalities were sufficient to support the trial court's finding that the girls would be able to testify out of his presence. However, our review of the record indicates Tadlock's testimony adequately supported the trial court's specific finding of necessity for the girls to testify outside the presence of the defendant.

On direct examination at the hearing, Tadlock testified that, after several months of therapy with her, both girls made disclosures of sexual abuse regarding the defendant. They also expressed to Tadlock that they were afraid of the defendant and that they feared being in his presence. When asked by the prosecutor if she had an opinion as to whether the girls would likely suffer serious emotional distress if they were forced to give testimony in the presence of the defendant, Tadlock responded, "Yes, ma'am, I believe that it would be very emotionally detrimental to both girls." Tadlock explained that her opinion was based on her work with the girls in the past and their fear of the defendant, as well as her conversation with the girls that morning. Tadlock further testified that E.D.1 would not be able to talk if she had to come into open court, and that E.D.2 would be "very scared" if she had to come into the courtroom. When asked by the prosecutor if she thought forcing the girls to testify in front of the defendant would cause them psychological or emotional distress, Tadlock responded in the affirmative.

– 23 –

On cross-examination, Tadlock testified the girls talked about being afraid of the defendant and not wanting to see him. When asked by defense counsel when the girls developed this fear of the defendant, Tadlock replied, "They were always afraid of Boris when they talked about it in therapy. They did not want to see him." Subsequently, the following colloquy between defense counsel and Tadlock took place:

> Q. Now the emotional distress that these children would allegedly suffer if they were to testify in open court, is that fear more of Boris Stogner or of telling their story to the jury?
>
> A. It's of having to face Mr. Stogner.
>
> Q. They didn't tell you that they were afraid they might be nervous talking about this in front of 12 people?
>
> A. I think it's a given that they would be nervous about that.
>
> Q. But somehow that's not enough, but yet with Boris thrown in, then suddenly we're in the realm of severe emotional distress?
>
> A. I think that it would bring up the trauma issues from the past, yes, sir.
>
> Q. In a 14-year-old girl?
>
> A, Yes, sir.
>
> Q. This 14-year-old girl, who I noted on tape to be extremely vocal to the point of, I think we'd call it in the colloquial diarrhea of the mouth, would not be able to reasonably communicate to a jury in this matter?

* * *

– 24 –

A. Yes, sir, she just expressed to me that she would not be able to communicate the sexual abuse in open court.

Q. Why?

A. Because she's afraid of seeing Mr. Stogner.

Q. To the point of she'd be dumbstruck if she were brought out here and saw this man who she'd been living with for years?

A. That she would not be able to talk about the sexual abuse.

Q. Well, I don't know that's what the statute says. So she would be able to reasonably communicate about things other than the sexual abuse?

A. If Mr. Stogner were in the room, I think that it would still create anxiety and create emotional distress for her if she had to talk about anything and face Mr. Stogner.

On redirect examination, Tadlock testified the girls were currently in counseling in the state where they had been relocated. The prosecutor then asked, "And do you know if their counselor has expressed a concern that these children would not be able to communicate or testify, and it would cause emotional distress if they're forced to testify in front of the defendant?" Tadlock replied, "Yes, ma'am, that's true."

Following redirect examination, the trial court, after noting that Tadlock indicated E.D.1 would be unable to reasonably communicate her testimony in court, asked her if it was likewise her opinion that E.D.2 would be unable to reasonably communicate her testimony in the presence of the defendant. Tadlock responded in the affirmative.

In ruling on the issue, the trial court stated, in pertinent part:

It's strictly a legal issue. The Court finds that the elements of the statute have been met as to both alleged victims, [E.D.1 and E.D.2]. The Court,

– 25 –

accepting the testimony of Ms. Tadlock that both severe emotional distress would be caused both children, and that both children are unable to reasonably communicate their testimony to the Court or jury in the absence of the measures which are being proposed; that being the utilization of a closed-circuit television, for lack of a better term.... The Court would, in order to ensure that Mr. Stogner's right to confrontation and right to assistance of counsel is most effectively dealt with, I'll allow one of the trial counsel to be present in the courtroom with Mr. Stogner, while one counsel is present with the witnesses.

Tadlock counseled E.D.1 and E.D.2 for over ten months, and made it clear in her expert testimony that E.D.1 and E.D. 2, if forced to give testimony in open court before the defendant, would likely suffer serious emotional distress and would be unable to reasonably communicate their testimony to the jury. Tadlock's testimony indicated, in particular, that the distress of E.D.1 and E.D.2 was more than *de minimis* and would be caused by the presence of the defendant, rather than from general courtroom drama. See Craig, 497 U.S. at 856. We find no reason to disturb the trial court's ruling that the elements of LSA-R.S. 15:283 had been met as to both E.D.1 and E.D.2. Accordingly, the trial court did not err in allowing E.D.1 and E.D.2 to testify outside the presence of the defendant.
This assignment of error is without merit.[16]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[17]

Under the stringent standards of review mandated by the AEDPA, petitioner may be granted relief with respect to this claim only if he shows that the foregoing state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as

---

[16] Stogner, No. 2009 KA 0172, 2009 WL 1717173, at *2-5; State Rec., Vol. V of V.

[17] State v. Stogner, 29 So.3d 1249 (La. 2010) (No. 2009-KO-1682); Rec. Doc. 4, p. 86.

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). He clearly cannot make that showing here.

Obviously, the state court correctly identified the controlling clearly established federal law, i.e. the Craig decision. In Craig, the United States Supreme Court expressly held that "where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation." Craig, 497 U.S. at 857.

Moreover, there is simply no basis for this Court to conclude that the state courts unreasonably applied Craig to the facts of this case. Here, as in Craig, the child witnesses testified under oath, were subject to full cross-examination, and were able to be observed by the judge, jury, and defendant as they testified, thereby adequately ensuring the reliability of evidence. See Craig, 497 U.S. at 857. While petitioner speculates that the procedure was not actually "necessary" to protect these two child witnesses from trauma which would have impaired their ability to communicate, the state courts, after careful consideration of the evidence presented, expressly found that the procedure was necessary. Petitioner has never presented any evidence whatsoever to the contrary.

Accordingly, because petitioner has failed to show that the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law, the AEDPA requires this federal *habeas* Court to defer to the state court decision and reject this claim.

### C.  Ineffective Assistance of Counsel

Petitioner also claims that his trial counsel was ineffective.  The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel.  Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 697 (1984).  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case,

viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the Strickland test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Because the state courts rejected petitioner's ineffective assistance of counsel claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Moreover, the United States Supreme Court recently explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be

no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Ibid.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 131 S.Ct. 770, 785-86 (2011) (citation omitted).  The Supreme Court then explained:

Surmounting Strickland's high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms,  not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by* <u>*Strickland*</u> *and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied* <u>*Strickland*</u>*'s deferential standard.*

<u>Id</u>. at 788 (citations omitted; emphasis added). This Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted in the instant case.

In the state post-conviction proceedings, the district court denied petitioner's claims, holding:

The petitioner's application raises one central claim of ineffective assistance of counsel; however, he contends that trial counsel were ineffective in three ways. First, Stogner claims that trial counsel were ineffective by failing to request a Daubert hearing relative to Dr. Atzemis' expertise. This particular issue was raised at the First Circuit Court of Appeal and that Court noted that there was no showing of a need for a Daubert hearing regarding the doctor's expert testimony. The First Circuit Court of Appeal stated in its opinion that Louisiana courts have long since accepted expert testimony in the field of forensic pediatrics and child abuse. Petitioner likewise makes a similar argument relative to the testimony of Bethany Case who was accepted as an expert in the field of forensic therapy. The Court finds that petitioner Stogner has failed to carry his burden of proof as to this claim of ineffectiveness of counsel. A review of the record in this matter reveals that the Court allowed full cross examination as to each expert's qualifications, and there is no showing by petitioner that the testimony of either Dr. Atzemis or Bethany case would have been excluded in a Daubert hearing. Accordingly, the Court finds this claim to be without merit and it is denied.

Next, petitioner Stogner claims that his counsel were ineffective by failing to request a "nunc pro tunc" hearing to

"ascertain whether or not he was competent to proceed with trial or assist in his defense." Stogner contends that he was addicted to "powerful painkillers, alcohol, had dropped out of school at a very young age and had a very low IQ." The Court finds that petitioner has failed to come forward with any evidence that he was incompetent at the time of trial and that his attorneys were ineffective for failing to request a competency hearing. Petitioner makes mere conclusory statements in an attempt to substantiate this claim of ineffective assistance; and the Court finds this claim to be without merit and it is denied.

Lastly, petitioner Stogner claims that his counsel were ineffective by failing to object or lodge a Batson challenge to the state's alleged actions of removing jurors on the basis of race. Again, petitioner does not provide a specific explanation identifying those jurors to which counsel should have objected and how the outcome of the trial would have been different had those jurors been selected to serve. The Court likewise finds this claim to be without merit and it is denied.[18]

Petitioner's related writ applications were then likewise denied by the Louisiana First Circuit Court of Appeal[19] and by the Louisiana Supreme Court[20] without additional reasons assigned.

For the following reasons, it is evident that the state court decision rejecting petitioner's ineffective assistance of counsel claims was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

---

[18] State Rec., Vol. IV of V, Reasons for Judgment dated November 28, 2011.

[19] State v. Stogner, No. 2011 KW 2389 (La. App. 1st Cir. Mar. 12, 2012); State Rec., Vol. IV of V.

[20] State ex rel. Stogner v. State, 97 So.3d 1017 (La. 2012) (No. 2012-KH-0758); State Rec., Vol. IV of V.

With respect to petitioner's first contention that his counsel was ineffective for failing to request a Daubert hearing relative to the expert testimony in question,[21] that claim is clearly meritless.  "The Louisiana courts have long accepted expert testimony in the field of forensic pediatrics and child abuse."  State v. Borden, 986 So.2d 158, 172 (La. App. 5th Cir. 2008); see also State v. Greene, 951 So.2d 1226, 1238 (La. App. 5th Cir. 2007).  Therefore, as the Louisiana First Circuit Court of Appeal noted in the direct appeal in this case, there was no need for a Daubert hearing, in that the result of such a hearing was a foregone conclusion.[22]  Counsel is not ineffective for electing not to pursue a futile Daubert objection.  See Shields v. Dretke, 122 Fed. App'x 133, 153 (5th Cir. 2005); see also Flick v. Warren, 465 Fed. App'x 461, 465 (6th Cir. 2012).

----

[21]  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  In an effort to prevent jurors from hearing expert opinions based on untested theories or invalid methods, the United States Supreme Court held in Daubert that, before a party can present expert testimony based on "scientific knowledge," the witness must demonstrate to the trial court, in its capacity as "gatekeeper," that the proposed expert testimony is based on "good" science and, therefore, sufficiently reliable.  Of course, it must be remembered:

> Daubert is an exegesis of Rule 702 of the Federal Rules of Civil Procedure and governs the admission of expert evidence in federal trials only.  Daubert does not bind the states, which are free to formulate their own rules of evidence subject only to the limits imposed by the Constitution.

Kinder v. Bowersox, 272 F.3d 532, 545 n.9 (8th Cir. 2001); see also Norris v. Schotten, 146 F.3d 314, 335 (6th Cir. 1998).  However, the Louisiana Supreme Court has found Daubert persuasive and, as a matter of state law, has similarly adopted a "requirement that expert scientific testimony must rise to a threshold level of reliability in order to be admissible under La.C.E. art. 702."  State v. Foret, 628 So.2d 1116, 1123 (La. 1993).

[22]  Stogner, No. 2009 KA 0172, 2009 WL 1717173, at *5 ("[T]here is no showing that there was a need for a Daubert hearing regarding the doctor's expert testimony in the field of forensic pediatrics.  The Louisiana courts have long accepted expert testimony in the field of forensic pediatrics and child abuse.  Borden, 986 So.2d at 172."); State Rec., Vol. V of V.

With respect to petitioner's two remaining allegations of ineffective assistance, he simply has not met his burden proof.  As previously noted, to prevail on an ineffective assistance of counsel claim, he must demonstrate by a preponderance of evidence that the claim has merit. Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  Here, as correctly noted by the state courts, he presented no evidence whatsoever, much less a preponderance of such evidence, to show either that he was incompetent to stand trial or that there was any basis for a Batson challenge.  Without such evidence, he simply cannot show that his counsel was ineffective for failing to move for a competency hearing or to lodge a Batson challenge.

In summary, petitioner has failed to demonstrate that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

### D.  Expert Testimony

Lastly, petitioner claims that his rights were violated when an expert was allowed to testify in a "non-existent medical field."  The state argues that this claim is procedurally barred in this federal proceeding.  The state is correct.

The United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal

claim and an adequate basis for the court's decision.  To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims.  This rule applies to state court judgments on both substantive and procedural grounds.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).

Here, the state courts clearly rejected petitioner's claim on procedural grounds.  On direct appeal, the Louisiana First Circuit Court of Appeal rejected the claim, holding:

In his second assignment of error, the defendant argues the trial court erred in allowing Dr. Adrienne Atzemis to testify as an expert in pediatric medicine with a sub-specialty in forensic pediatrics.[FN3]  Specifically, the defendant contends the trial court failed to apply the Daubert standard before allowing Dr. Atzemis to testify as an expert in the field of forensic pediatrics, which is not a recognized sub-specialty of pediatric medicine.

[FN3] Dr. Atzemis testified she was with the Audrey Hepburn Care Center at Children's Hospital in New Orleans.  The trial court accepted Dr. Atzemis as an expert in the field of pediatric medicine with a sub-specialty in forensic pediatrics.

The standard of admissibility for determining the reliability of expert scientific evidence is set out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  The defendant waived his right to complain by failing to request a Daubert hearing in the trial court.  See State v. Borden, 07-396 (La.App. 5th Cir. 5/27/08), 986 So.2d 158, 172, writ denied, 08-1528 (La. 3/4/09), 3 So.3d 470.  This failure to request such a hearing was noted by the trial court after defense counsel argued there was "no such critter" as forensic pediatrics:

This is neither the time or the place.  It's been well known that this expert was going [to] be called for some period of time.  There's been no Daubert

– 35 –

> hearing filed.   I am going to allow full cross-examination relative to qualifications.
>
> Accordingly, this issue was not preserved at trial and is not properly before this court.  <u>See</u> LSA-C.E. art. 103(A)(1); LSA-C.Cr.P. art. 841.
>
> Moreover, there is no showing that there was a need for a <u>Daubert</u> hearing regarding the doctor's expert testimony in the field of forensic pediatrics.  The Louisiana courts have long accepted expert testimony in the field of forensic pediatrics and child abuse. <u>Borden</u>, 986 So.2d at 172.
>
> This assignment of error is without merit.[23]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning reasons;[24] however, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground."  <u>Finley</u>, 243 F.3d at 218.

As an initial matter, this Court notes that it is of no import that the state courts alternatively found that petitioner's underlying claim was meritless.  "A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a [petitioner's] claim."  <u>Fisher v. Texas</u>, 169 F.3d 295, 300 (5th Cir. 1999).

Moreover, the procedural rule invoked by the state courts in this case, i.e. Louisiana's rule that an error is waived unless a contemporaneous objection is made, is clearly an independent and adequate state procedural rule.  <u>Duncan v. Cain</u>, 278 F.3d 537, 541-43 (5th Cir. 2002).  When, as here, the state courts have rejected a petitioner's claim based on an independent and adequate

---

[23] <u>Stogner</u>, No. 2009 KA 0172, 2009 WL 1717173, at *5; State Rec., Vol. V of V.

[24] <u>State v. Stogner</u>, 29 So.3d 1249 (La. 2010) (No. 2009-KO-1682); Rec. Doc. 4, p. 86.

state procedural rule, "federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice." Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999). In the instant case, petitioner demonstrates neither.

"To establish cause for a procedural default, there must be something *external* to the petitioner, something that cannot fairly be attributed to him." Johnson v. Puckett, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted). Objective factors that can constitute cause include interference by officials that makes compliance with the state procedural rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available to counsel, and ineffective assistance of counsel. Romero v. Collins, 961 F.2d 1181, 1183 (5th Cir. 1992).

As noted above, petitioner argues that his counsel was ineffective for failing to request a Daubert hearing; therefore, the Court will assume that he also argues that ineffectiveness is the cause for the procedural default of this underlying claim. However, that assumption does not ultimately aid petitioner. As previously explained, his ineffective assistance of counsel claim has no merit. It is clear that a meritless ineffective assistance of counsel claim cannot serve as cause for a procedural default. Sherill v. Hargett, 184 F.3d 1172, 1176 (10th Cir. 1999); Turner v. Compoy, No. 91-55842, 1993 WL 425372, at *3 n.2 (9th Cir. Oct. 19, 1993); Arita v. Cain, Civ. Action No. 11-636, 2011 WL 4738666, at *11 (E.D. La. Aug. 25, 2011), adopted, 2011 WL 4738658 (E.D. La. Oct. 6, 2011), aff'd, 500 Fed. App'x 352 (5th Cir. 2012), cert. denied, 2013 WL 664688 (U.S. Apr. 15, 2013); Bridges v. United States, No. 04 Civ. 2715, 2005 WL 1798084, at *2 (S.D.N.Y. Aug. 1,

2005); Davie v. Mitchell, 324 F. Supp. 2d 862, 872 (N.D. Ohio 2004); McLaughlin v. Carroll, 270 F. Supp. 2d 490, 516 (D. Del.2003).

Because the purported ineffectiveness of counsel cannot serve as cause for the default of this claim, and because petitioner has established no other cause for default of the claim, the Court need not consider whether actual prejudice would result from the application of the procedural bar. Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996) ("Absent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice.").

In that petitioner has not met the "cause and prejudice" test, this Court need consider this claim only if the application of the procedural bar would result in a "fundamental miscarriage of justice."  However, in order to establish that there would be a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him.  Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted."  Finley, 243 F.3d at 220 (citations omitted).  Petitioner has made not made that showing; on the contrary, the evidence against him, including the victims' testimony, was substantial.  Therefore, he has not established that any miscarriage of justice will result from the application of the procedural bar.

For these reasons, petitioner's claim that his rights were violated when an expert was allowed to testify in a "non-existent medical field" is procedurally barred and cannot be considered by this Court.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Boris Stogner be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[25]

New Orleans, Louisiana, this seventh day of May, 2013.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[25] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.